Pages 1 – 31

                      UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

                 BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

UNILOC USA, INC., et al.,          )
                                   )
              Plaintiff,            )
  VS.                               ) NO. C 18-00363 WHA
                                   ) Related Cases:  C 18-360,
                                   ) C 18-365, C 18-572
APPLE, INC.,                       )
                                   )  San Francisco, California
              Defendant.           )
_____)

                                   Tuesday, September 4, 2018

                      **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                          PRINCE LOBEL TYE LLP
                          One International Place
                          Suite 3700
                          Boston, Massachusetts   02210
                 **BY:  JAMES J. FOSTER, ESQ.**

For Defendants:
                          GOLDMAN ISMAIL TOMASELLI
                            BRENNAN & BAUM, LLP
                          564 Randolph Street
                          Suite 400
                          Chicago, Illinois   60661
                 **BY:  MICHAEL T. PIEJA, ESQ.**

Also Present:
                 **MARC BREVERMAN, ESQ.**
                 **JIMMY RUCK**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
                 Official Reporter, U.S. District Court

**Tuesday - September 4, 2018**                              **10:07 a.m.**

<u>P R O C E E D I N G S</u>

**THE CLERK:**  Calling Civil Action 18-363, and related

Civil Cases 18-360, 18-365, 18-572.  Uniloc United States of

America, Inc., et al. versus Apple, Inc.

Counsel, please step forward and state your appearances

for the record.

**MR. FOSTER:**  For plaintiff, James Foster.

**MR. PIEJA:**  Good morning, Your Honor.  Michael Pieja

for the defendant Apple.  With me today is Mr. Marc Breverman,

Apple's in-house counsel, and Mr. Jimmy Ruck, who is a summer

associate with our lawfirm.

**THE COURT:**  Okay, thank you.  So how can I help the

lawyers today?

**MR. PIEJA:**  Your Honor, while we had been able to

make some progress on the issues presented in the discovery

letter brief, I think there are still a number of issues that

remain outstanding from the Court -- or before the Court, if

you are inclined to take them up for resolution at this time.

**THE COURT:**  Go ahead.  What is the first item?

**MR. PIEJA:**  Okay.  So as we laid out in the discovery

brief, the issue here that we're trying to get the bottom of

is:  Which entities currently own the patents that are being

asserted against my client.

And what we have learned from the limited discovery that

 1  we have gotten to date, almost all of which was produced

 2  yesterday, is that in March of this year, Uniloc Luxembourg,

 3  who is one of the plaintiffs here and who was at the time --

 4           **THE COURT:**  March or May?

 5           **MR. PIEJA:**  So there's two documents.  In March of

 6   this year, Uniloc Luxembourg entered into an asset purchase

 7   agreement to sell all the patents-in-suit to a newly-formed

 8   entity called Uniloc 2017.  That deal -- and then after that

 9   time, obviously, we had a case-management conference in this

10   case; we had the CMC statement.  None of that came up at that

11   point.

12       In early May, we have learned Uniloc 2017 actually closed

13   that deal.  And since that time, it appears Uniloc Luxembourg

14   hasn't had any rights in the patents-in-suit.

15       At a similar time, March, another entity was created that

16   is not a party to this case.  Uniloc Licensing.  And that

17   entity was also granted license rights, exclusive license

18   rights, in the patents-in-suit.  And while we have gotten

19   portions of the asset purchase agreement, we do not have the

20   entire agreement.  And what we do have has been redacted.

21       So the first issue that we would ask Your Honor is we

22   believe that Uniloc should be ordered to produce the entire

23   unredacted asset purchase agreement, including the attachments.

24       Several of the documents with these attachments that they

25   haven't produced relate to issues like what encumbrances are on

1    the patents, and what other entities have a reversionary

2    interest in the patents, so could wind up with or may have

3    wound up with a title or ownership interest in some kind of

4    them.

5         I think those issues are all directly relevant to the

6    standing issues that our discovery brief raises.  I think it's

7    important that they be got to the bottom of now.

8         And at this point, my -- Uniloc is taking the position

9    that they either don't know about whether they will produce the

10   documents, or are unwilling to commit to so doing.

11             **THE COURT:**  All right.  Let's hear from Uniloc.

12             **MR. FOSTER:**  So Your Honor, just a few corrections.

13        There wasn't an asset purchase agreement in March.  We

14   understand these corporate things work out, then there's some

15   diligence period.  And then the transaction closed in early

16   May.

17        Those documents have (Inaudible) talk about in a minute

18   were produced --

19             **THE COURT:**  You've got to speak more clearly -- or

20    adjust the mic.  It's hard to hear you.

21             **MR. FOSTER:**  Okay.

22             **THE COURT:**  So maybe you can adjust it a little

23    higher.  Thank you.

24             **MR. FOSTER:**  Okay.  All right.  So that was the

25    schedule.  There was one mistake.

1    And then one of my colleagues said the way the transaction

2    was structured, 70 or 80 pages, some document some major

3    lawfirm drafted, so with a lot of details in it.  But the way

4    it was structured was that the entire patent portfolio owned by

5    Uniloc Luxembourg was transferred to this Uniloc 2017 entity.

6    But the interesting wrinkle was that the entity which had

7    the exclusive license, Uniloc USA, still has an exclusive

8    license with respect to all suits which had been filed prior to

9    May, including these suits.  A new entity, Uniloc USA

10   Licensing, was set up to handle newly-filed litigation.

11   Regardless, we provided the documentation with respect to both

12   companies to Apple on that.

13   The issue which has come up and we discussed in advance of

14   the hearing here, there were actually two or three issues.

15   Mr. Pieja pointed out that the documents we produced to him did

16   not include certain schedules, including schedules dealing with

17   encumbrances.

18   I told him that the reason for that was my firm didn't get

19   them and didn't forward them, but we would look at them, and

20   assuming that there's nothing in there that we would object to,

21   said we'd produce them.

22   The only caveat I got -- I gave him on that was that our

23   client objects -- since the issue is standing, our client

24   objects to producing what I call the financial details.  How

25   much did you pay, this kind of thing.  And the client doesn't

1    see how that's -- the amounts are relevant to standing, and

2    wanted us to object to that.

3        We would produce all of the documentation, and redacting

4    only the financial amounts, which aren't relevant to standing.

5            **THE COURT:**  What do you say in reply?

6            **MR. PIEJA:**  Yes, Your Honor.  If what Mr. Foster is

7    representing to the Court is that they will produce all of the

8    documents referenced in the asset purchase agreement, which

9    include -- there are specific sections that lay these out --

10   additional transaction documents, ancillary agreements, and

11   disclosure schedules -- I didn't understand that to be their

12   position before, but obviously, if they are willing to produce

13   them, we appreciate that.

14       With respect to the financial terms, while those -- we

15   believe those should be produced, as well, for two reasons.

16   First, ultimately, the purchase price that this entity pays for

17   the patents-in-suit in this case is potentially very relevant

18   when we get to the damages phase of the case.  Because, you

19   know, it may not -- will not surprise that you Uniloc is asking

20   for an astronomical amount of money for these patents.

21       And if the negotiation between the entities that are

22   transferring the patents shows that they were actually valued

23   at a much lower amount, that is a factor that can be considered

24   by an expert on a damages analysis.

25       Further, the financial relationship between entities that

1   are transferring all or a portion of rights in a patent has

2   been found to be relevant to show who the real party in

3   interest is.  In other words, if the rights or financial

4   interests were transferred in a way that effectively transfers

5   the entire financial interest in this litigation from one

6   entity to another, that's relevant to showing who the real

7   party in interest is.

8        And further, finally, Your Honor, I don't think they have

9   articulated any basis, any valid basis on which they could

10  redact these documents, simply because their client doesn't

11  feel that they want to produce the financial terms.

12       So we would respectfully request that the Court order full

13  production of the asset purchase agreement and the additional

14  transaction documents, ancillary agreements, and disclosure

15  schedules referenced in and incorporated in that agreement.

16            **MR. FOSTER:**  So --

17            **THE COURT:**  Any reply to that?

18            **MR. FOSTER:**  Yes.  Just a few short points,

19   Your Honor.

20       The transaction document, itself, that I mentioned was 50

21  to 80 pages.  It's quite clear -- and speaks for itself --

22  quite clear as to who now owns the patents.

23       What Mr. Pieja is raising is a different point.  He wants

24  to know:  Well, okay, but who controls the purchaser, who are

25  the stockholders, board of directors?  That kind of stuff.

```
 1          And the rules require us in the documents we file in this

 2     court, to list parents and companies that own more than

 3     10 percent of the shares, this kind of thing, to allow recusal

 4     where appropriate.  But I don't understand the relevance --

 5     otherwise, the relevance to who the stockholders are of these

 6     companies, and how they split up the money between them.

 7          This is the kind of thing which gets my client's hackles

 8     up.  How is that relevant?  I frankly don't have an answer to

 9     that question.

10          THE COURT:  Okay, here's the answer.  Unless

11      somebody's got something more to say.

12          MR. PIEJA:  The only point I would make, Your Honor,

13      is Mister --

14          THE COURT:  If I give you a chance to speak, I give

15      him a chance to speak.  So, go ahead.

16          MR. PIEJA:  Okay.  Mr. Foster made references to

17      disclosures that are required to be made to this Court

18      regarding ownership.

19          In fact, none of the entities that we're talking about

20     here today were ever disclosed by plaintiffs.  Even though they

21     have known about this transaction since at least the beginning

22     of May, and we believe, March.

23          So I don't think it's quite fair for Mr. Foster to claim

24     that somehow we are getting this information from the mandatory

25     disclosures, when we, in fact, had to find it out on our own,
```

1  and bring the issue to plaintiffs' attention.

2          THE COURT:  All right.

3     Any reply to that?

4          MR. FOSTER:  Yeah, Your Honor.  We have filed a

5   motion with the Court to add the new party as, say, a

6   plaintiff.  And that motion's already been filed with the

7   Court.

8     So other than -- Mr. Pieja said we should have done it

9   sooner; fine.  But other than that, I have nothing to say.

10          THE COURT:  All right.  I am ready to rule now.

11     The Court has had this problem in a different case.  And

12   the bottom line is that plaintiffs should produce all of this

13   material, including the dollar amounts, including all of the --

14   every single document, no redactions, so that the other side

15   can trace the bundle of rights that every entity has or

16   retained or assigned, how it got split up.

17     And there are two reasons that it's relevant.  In one

18   other case, a very creative scheme was used by the plaintiff to

19   make it look like there had been an assignment that would have

20   created standing.  But so many other rights were held back or

21   compromised that I said:  No, that you didn't have standing.

22   Not you, but somebody else.

23     That went up to the Federal Circuit.  But before they

24   argued it, the plaintiff in that case thought better of it, and

25   dismissed the case.  The appeal.  So I think -- I don't know,

1    I'm just not privy to all of the machinations that go on by

2    someone like Uniloc, but I believe machinations are possible to

3    -- I just don't know all the motivations behind it.

4        All I can tell you is that in that case, they were too

5    cute by half, and maybe you were too cute by half.  And they

6    get -- the Apple people get to look at it, and see if they

7    think there's been standing.  So, I think that's relevant.

8        It should have been disclosed to me sooner.  But I'm going

9    to pass that for now.

10       The second reason it's relevant is that the financial

11   terms are highly relevant.  If -- if you are seeking $1 million

12   from Apple, but you sold it for a hundred thousand, that's a

13   pretty good argument that you're way over-priced.  And I would

14   think that's highly relevant.

15       However, that should be under a protective order so it

16   can't be used in some other case.  So that should be just for

17   purposes of this case only, and to give to your experts and the

18   lawyers, but nobody else.  So that should be the -- the dollar

19   amounts should be under protective order.  So that's what I'm

20   going to order.

21       Now, I think it ought to be produced within a week or two

22   weeks.  How much time do you need to get all of this?  And I

23   want you to do a good job, thorough job.

24       **MR. FOSTER:**  Oh, not much at all, Your Honor.  If we

25    can get to it them by the end of this week, we will.

1          **THE COURT:**  Well, all right.

2          **MR. FOSTER:**  You give me a deadline, how about a week

3    from today?

4          **THE COURT:**  All right, a week from today is your

5    deadline, at noon.  So that's the best I can do.

6        But on this one, I think Apple wins completely, subject

7    only to the protective order part.  May not go anywhere,

8    because there -- may be that the transferee gets to come into

9    the case under Rule 25, and that the new transferee has all the

10   rights that they need, and end of story.

11       Okay.  Is that it?

12         **MR. PIEJA:**  There are a few other issues that may

13    have been resolved by Your Honor's ruling, but I just want to

14    raise them to see if Mr. Foster agrees.

15       In addition to the documents referenced in the asset

16   purchase agreement, the original owner, Uniloc Luxembourg,

17   granted a security interest in the patents-in-suit to a third

18   party called Fortress.  And that security interest gave, we

19   believe, Fortress the right to take possession of the assets

20   upon certain conditions.

21         **THE COURT:**  Sure.  That ought to be produced.  To me,

22    all of these -- "machinations" is the word I'm using.  The

23    Federal Circuit has some law on how much you can give away.

24    And I believe the parties in these kinds of cases push it

25    right up to the line to see how much they can give away and

1    still have a standing.  And it may be you miscalculated.  So I

2    think that ought to be produced, of course.

3         All right, what's the next one?

4         **MR. PIEJA:**  This is a relatively minor issue, Your

5    Honor.  But in reviewing the asset purchase agreement, there's

6    a provision in three that indicates the potential for a

7    conflict of interest with respect to another lawfirm that

8    appears to have been representing the new entity, Uniloc 2017,

9    that may be -- that Uniloc has sought to bring into this case,

10   because they may also be doing work for Apple.

11        And we would -- I would request permission -- that page is

12   currently designated attorneys' eyes only.  So I can't -- at

13   this point, according to Mr. Foster, I can't tell my client the

14   name of the lawfirm that may have the conflict, so that they

15   can investigate whether in this case we have a problem with

16   that.

17        And so I would ask that that page be designated as

18   confidential, but that I be allowed to tell the name of the

19   lawfirm to my client so that we can evaluate whether by

20   representing, apparently, Uniloc in a transaction related to

21   this case, a conflict of interest has arisen that would require

22   some action.

23        **THE COURT:**  What do you say to that, Mr. Foster?

24        **MR. FOSTER:**  Your Honor, what I would point out -- I

25   should tell you, I don't have too much of a dog in this fight.

1          What I pointed out to Mr. Pieja is that he wanted to

2    use -- wanted his client to be able to use the information for

3    purposes outside of the lawsuit so that --

4          THE COURT:  To do what?

5          MR. FOSTER:  He wanted his client to be able to use

6     the information for purposes outside the lawsuit, so that

7     technically was a violation of the protective order; we should

8     bring it up with the Court to make sure the Court is okay with

9     it.

10          THE COURT:  So I'm -- I'm not sure what the answer

11    is.  But let me see if I've gone the scenario right.

12          MR. FOSTER:  Sure.

13          THE COURT:  There's some other lawfirm out there in

14    the world that represents -- or represented Apple.  Maybe

15    still does, or maybe wants to in the future.  And in the asset

16    purchase agreement on the Uniloc side, there was a disclosure

17    about a potential conflict of interest that that lawfirm had,

18    by reason of the Apple representation.

19       Is that -- is that it?

20       Tell me what it is, then.

21          MR. FOSTER:  I'm learning, as you are, Your Honor.

22    But this is the way I understand it.

23       Lawfirm X drafted this 80-page document which transfers a

24    whole bundle of patents, and doesn't mention Apple or anything.

25    For all I know, Lawfirm X has no idea that the agreement would

1  have any effect on Apple.  And Lawfirm X is not otherwise

2  involved in this suit.  Hasn't entered an appearance, whatever.

3      Apparently Mr. Pieja is concerned that Lawfirm X is

4  drafting that document.  Some of it might create -- I'm not

5  saying he's right or wrong.  Some of it might create some kind

6  of a conflict with Apple, and he wants to be able to tell Apple

7  that Lawfirm X is drafting the transfer document.

8      We don't really have a dog in that fight.  But because

9  that seems to be technically in violation of the order because

10  he's using information for purposes outside the lawsuit, I told

11  him we had to bring it up in front of the Judge to authorize

12  that disclosure.

13      **THE COURT:**  And on the face of the document, is it

14  clear who -- who Lawfirm X is?

15      **MR. FOSTER:**  They are listed as -- in the notice

16  paragraph, it said any notices should go -- copies should be

17  sent to Lawfirm X.

18      **MR. PIEJA:**  If I may, Your Honor?

19      **THE COURT:**  (Inaudible)

20      **MR. PIEJA:**  First of all, I don't think -- it is not

21  correct for Mr. Foster to state that the document in question

22  doesn't identify Apple.  There is a schedule in that document

23  that specifically lists out litigations that are to be pursued

24  by these entities that are being created.  And there are over

25  half a dozen litigations on that list where the Uniloc entity

1    is proceeding against Apple.

2        So the drafters of that document knew that the entities

3    being formed, who we believe this lawfirm represented in the

4    formation, that those entities were being formed for the

5    express purpose of pursuing litigation against my client.

6        **THE COURT:**  Well, was Lawfirm X -- to your knowledge,

7    one way or the other, was Lawfirm X then representing Apple?

8        **MR. BREVERMAN:**  (Inaudible)

9      (Reporter interruption)

10       **MR. PIEJA:**  Oh, sorry.  I inquired of my client, but

11   it was foolish because I haven't been able to tell my client

12   who the firm is.

13       Based on public records, I believe that the answer to that

14   question is yes, that they are currently representing Apple.

15   But I could not swear, under oath, that that is correct.

16       **THE COURT:**  Okay.  Anything more?

17       **MR. FOSTER:**  Nothing, Your Honor.

18       **MR. PIEJA:**  Not on this point, Your Honor.

19       **THE COURT:**  Okay, here's the answer.  I think you

20   should tell Lawfirm X.  And that means that your clients

21   should know who that is, if for no other reason than Apple and

22   X can have a conversation, and maybe not -- not exacerbate a

23   potentially embarrassing situation.

24       I want to be very clear.  I'm not saying they have done

25   anything wrong.  X.  I'm not saying that X has done anything

1    wrong.  But, but if we just continued on with them blindly

2    representing Uniloc in a situation where the lawyers think

3    there's at least a small potential for a conflict, then I think

4    it ought to be out in the open, with X being aware that you all

5    are aware of it, and that the client, Apple, is aware of it.

6         And that -- but I'm going -- I'm going -- I think I should

7    make an important statement to Apple.  I think once you learn

8    who it is, you should have that conversation.  I would be very

9    disappointed if Apple were to hold onto that information and

10   sandbag X, and then not bring it up with X, so that X is

11   sandbagged.  I would not want sandbagging.

12        Do you understand what I'm saying?  In other words --

13             **MR. PIEJA:**  Yes, Your Honor.

14             **THE COURT:**  In other words, I'm going to let you

15    reveal who X is to your client.  But your client sure better

16    take up the issue with X, and soon, so that X can be aware

17    that Apple is aware, and that Apple has a problem with it, if

18    they do have a problem.

19        I don't -- I want to head off the situation which I can

20   easily imagine, machinations on Apple's part, where Apple sits

21   back in the weeds and lets that other firm continue getting

22   itself in potential trouble, and then says, "Ha, ha, I got

23   you."

24        We're not going to have that.  And I would be disappointed

25   in Apple.

1          So do you understand the condition over there?

2               **MR. BREVERMAN:**  I understand, Your Honor.

3               **THE COURT:**  Thank you.  All right.

4          All right, what's the next problem I can solve?

5               **MR. PIEJA:**  The very last thing, and it's

6     peripherally related to the standing issues, is we have

7     requested separately a deposition on the documents we just

8     received yesterday.  And --

9               **THE COURT:**  Sure.  You ought to --

10              **MR. PIEJA:**  -- Mr. Foster is opposed.

11              **THE COURT:**  Some depositions.  I can't say how many,

12    but I'd say at least two depositions of people that are

13    implicated by these documents.

14              **MR. PIEJA:**  Thank you, Your Honor.  And those are all

15    the issues that Apple had, Your Honor.

16              **MR. FOSTER:**  I have a few, Your Honor.  Some of them

17    are just a matter of giving the Court notice.

18         We had filed a motion to add Uniloc 2017 as a plaintiff.

19              **THE COURT:**  Sure.

20              **MR. FOSTER:**  Mr. Pieja has asked for additional time

21    to respond to that motion.  He asked for an additional ten

22    days.  We don't have a problem with that.  But we don't want

23    to be submitting stipulations to the Court without the Court

24    knowing about it.

25              **THE COURT:**  Okay.  You can -- I think what you should

1    do is hurry up and take these depositions so you can use that

2    information in the motion and your opposition.  But you ought

3    to get this all done pronto.  Pronto.  Like next week, you

4    take these depositions.

5          **MR. PIEJA:**  Yes, Your Honor.

6          **THE COURT:**  If he says he can try to get you the

7    documents this week, maybe it will be next -- but pronto.

8    "Pronto" is the name of the game.

9          **MR. PIEJA:**  We will take them extremely rapidly, Your

10   Honor.  My only request on the extension is if they're going

11   to produce documents a week from today, we would ask for just

12   one week from the day we get the documents.

13         **THE COURT:**  Fine.

14         **MR. PIEJA:**  Okay.

15         **THE COURT:**  To take the depositions.  And Uniloc will

16   definitely cooperate in arranging the depositions.

17         **MR. FOSTER:**  So there's no uncertainty, it will be

18   one week from our due date?  Because we may produce the

19   documents earlier.  But we don't want it floating around, what

20   your deadline is.

21         **THE COURT:**  One week from when you complete, in full,

22   everything you're supposed to complete.

23         **MR. FOSTER:**  Okay.

24         **THE COURT:**  Everything.  Not just 99 percent.

25         **MR. FOSTER:**  All right.

1          **THE COURT:**  All right.  And then, you all let me know

2     how far off you have to push the hearing date in order to

3     accommodate the depositions.  You'll have to do the math in

4     your head.

5          But -- you don't have to push it off, but if you do need

6     to, then please let me know, and we'll move it on the calendar.

7          **MR. PIEJA:**  Yes.  We'll work that out amongst

8     ourselves.

9          **MR. FOSTER:**  The next issue, again by way of

10    scheduling, Apple filed a motion to strike some renewed

11    infringement contentions.  Our response is due Thursday of

12    this week, which by some coincidence, is also the date that

13    papers are due on the summary-judgment motions.

14         So I asked Mr. Pieja for a week to respond to their

15    motion, and he has no problem with it.  But again, we want --

16         **THE COURT:**  That's fine.

17         **MR. FOSTER:**  That's okay?

18         **THE COURT:**  That's okay.

19         **MR. FOSTER:**  I wanted to tell the Court about that.

20         **THE COURT:**  Does that mean the hearing on that motion

21    has to be -- is there a hearing date?

22         **MR. PIEJA:**  There is, Your Honor.  It will be the

23    27th.  And we intend to file our reply in a very prompt

24    manner, once they file their opposition.

25         **THE COURT:**  All right.  Well, then, maybe we'll keep

1    that date, then.

2         Okay, what else?

3         **MR. FOSTER:**  The next issue -- it's a little

4    confusing.  There was a case of -- a -363 case, brought on a

5    particular patent.  That same patent was involved in a case in

6    the District of Washington against, I believe, HTC.

7         The judge up there granted a Rule 101 motion dismissing

8    the case.  Uniloc filed a notice of appeal.  I think our appeal

9    brief is due later this month.

10        But because it didn't seem to move forward -- didn't make

11   sense to move forward with the case here until the Federal

12   Circuit works out that appeal.

13        The confusion arises because Apple hasn't made up their

14   mind what they want do about that.  There are three choices.

15   One is to dismiss the pending action without prejudice, and

16   wait for the Federal Circuit.  A second option is simply to

17   stay the pending action, and wait for the Federal Circuit.

18        The third option is to dismiss the pending action with

19   prejudice, based on the Washington decision.  And then a notice

20   of appeal gets filed, and the appeal gets merged with the

21   appeal before the Federal Circuit.

22        Our preference is the first.  I've given Mr. Pieja the

23   choice.  He says his client hasn't made up his mind.  And I'm

24   just calling it to the Court's attention.

25        **THE COURT:**  Well, have you all made your motions

1    for -- on the showdown procedure?

2              **MR. PIEJA:**  We have, Your Honor.  Replies are due

3    this Thursday.

4              **THE COURT:**  Is the patent that's in -- I'm just

5    hearing about, is that one of your motions?

6              **MR. PIEJA:**  It is not.  Although if we went to

7    another round of that procedure, we would likely move for

8    summary judgment of invalidity, based on collateral estoppel.

9    For that particular patent.

10        Given that generally, a decision like the one issued in

11   the Western District of Washington would be given preclusive

12   effect while on appeal, we believe that Uniloc would be

13   collaterally estopped from asserting that that patent is valid.

14             **THE COURT:**  Well, here's the thing, Mr. Foster.  You

15   know, a District Judge could be wrong.  I've been wrong

16   several times.  And the Federal Circuit could reverse that

17   judge.

18        So I think the first choice is for you to decide if you

19   want to withdraw assertion of that patent.  If you do, then

20   just withdraw it.  And it won't be part of the case.  But it

21   won't be in limbo,and the statute of limitations will then

22   begin to run on that one.

23        So --

24             **MR. FOSTER:**  We have offered, Your Honor, to non-suit

25   ourselves, without prejudice.  That's one of the three

1    options.  And we're waiting for Apple to make a choice.

2           THE COURT:  Well, if you want to do that and you

3    refiled it, the statute of limitations would have run, in

4    part, on that six-year period.

5           MR. FOSTER:  The six-year period will start anew,

6    Your Honor.  But that's okay, because we don't go back that

7    far, anyway.  So that's fine with us.

8           THE COURT:  All right.  So I think --

9           MR. FOSTER:  We can --

10          THE COURT:  I'm -- in light of the ruling by the

11   judge in Seattle, I'll give you the option to exercise soon.

12   If you want to withdraw that patent without prejudice, then it

13   will be out of the case.

14          MR. FOSTER:  File the document tomorrow, Your Honor?

15          THE COURT:  Fine.  You can do that.

16          MR. FOSTER:  I have one more issue.

17      Unless you have anything more, Mr. Pieja?

18          MR. PIEJA:  No, Your Honor.  We don't have any

19   further issues.

20          MR. FOSTER:  All right.  A dispute's come up in the

21   last week or two with Apple we want to -- need the Court's

22   assistance with.

23      About two months ago, Apple subpoenaed the inventors on

24   one of the patents involved in the shootout procedure to

25   produce documents.

1        What I had expected, because this is the way I've

2   practiced all these years, is a third-party subpoena, the third

3   party is producing documents by compulsion.  And then whoever

4   issues the subpoena, when they get the documents, they then

5   make them available or produce them to the other parties in

6   litigation.  And not require a second subpoena, that kind of

7   thing.  And sometimes third parties don't have documents.

8   Okay.

9        We didn't get any documents from Apple from that inventor,

10  so we have assumed nothing had been produced.  Then Apple filed

11  some of their papers on the shootout procedure where they cited

12  some prior art, which was just a few months earlier than the

13  filing date.

14       So we called up one the inventors, who said:  Oh, I sent

15  my documents to Apple two months ago.

16       I said:  What?  And then that started off a chase.

17       It turns out that Apple did get documents two months ago;

18  they didn't send them to us.  I'll let Mr. Pieja make his own

19  excuses to the Court.  But we have been pressing him for the

20  last week or so on that.

21       They said:  Well, some of the documents were privileged,

22  so we had to send them to the HP counsel to check them for

23  privilege.

24       Didn't smell quite right.  We asked them to produce to us

25  all correspondence between their offices and the witness or HP

1   counsel with respect to the document production.

2       At some point I think last week, they said they would give

3   it to us.  This morning, Mr. Pieja said they would give it to

4   us.  But we still don't have them, and we wanted them in

5   advance of this hearing, so we can spotlight how that would

6   affect the shootout procedure.

7       I'm raising that now.  And I'll allow Mr. Pieja to give

8   his response.

9           **MR. PIEJA:**  May I, Your Honor?

10          **THE COURT:**  Sure.

11          **MR. PIEJA:**  Well, first of all, I'm not entirely sure

12   what this has to do with any of the issues that were before

13   the Court today.  But --

14          **THE COURT:**  Well, maybe none, but let me hear -- this

15   is not part of your discovery letter.  But nevertheless, maybe

16   I can solve it for you.

17       Go ahead.

18          **MR. PIEJA:**  And again, I'm not sure what they're

19   talking about here, because they have the documents in

20   question.

21       To be very clear, there's an inventor on one of the -- the

22   named inventor on one of the patents is a Miss Elaine Lesher.

23   We did serve a subpoena on Ms. Lesher.  And it turned out that

24   Uniloc had never bothered to contact her or make any effort to

25   communicate with her before we did that.

 1          We received certain documents provided by Ms. Lesher in

 2    response to that subpoena.  She told us, before she produced

 3    those, that she had concerns because she had worked at the time

 4    for -- I think it was 3Com, who was then the assignee of the

 5    patent.  She said:  I have concerns about the confidentiality

 6    of these documents, and I have concerns that some of these

 7    related to things I discussed with lawyers.

 8          We located the successor in interest to 3Com, which is HP,

 9    and we provided their outside counsel with all the materials

10    that we received from this inventor.  They decided to claim

11    privilege over some of those documents, and asked us to

12    basically sequester them and not review them further, which we

13    did.

14          And any documents that were not privileged have been

15    produced to Mr. Foster's firm.  In fact, they had those last

16    Wednesday.  So I'm not sure what their complaint is on that

17    issue.  There's not been any withholding of documents or delay

18    of anything going on here.

19          The third party was an individual who wasn't entirely sure

20    how to comply with the subpoena.  So my understanding is they

21    mailed documents to an address or a person other than the

22    person who normally would receive them.  And so they -- the

23    inventor got the documents mixed up a little while, but we got

24    it straightened out, and they've had all of them.

25          And I told Mr. Foster this morning as to our

1   communications with -- my firm's communications with these

2   witnesses.  I offered to provide him the documents, those

3   witnesses -- those communications, right now.  They're

4   literally at a vendor, waiting for the little numbers to be

5   stamped on them.  And as soon as they come out, they're going

6   to go over.

7       There's nothing to see here.  They've got the substantive

8   documents, and they can have the other documents just as soon

9   as they want them.

10      I don't really understand what he's talking about here,

11  and I don't understand what substantive relevance this has.

12  But there's nothing that they want that we have not either

13  produced, or are offering to produce immediately.

14          **THE COURT:**  Okay.  What do you say to that?

15          **MR. FOSTER:**  Two things, Your Honor.

16      We did get some documents last week after we stirred the

17  pot and probed.

18      I'm not here to embarrass counsel, and that's not the

19  purpose of asking for their communications.  But we do need to

20  show the Court that they have been sitting on this issue for

21  two months, now.  And we were not a party to any of that

22  back-and-forth with HP, and we should have been.

23      I looked at the documents that we got last Wednesday, and

24  it indicates that the date of invention can be moved back at

25  least six months from the filing date.

1      We have asked for a privilege list since -- apparently,

2  HP, by sending them the documents, they're claiming a

3  privilege.  We've asked for a privilege list which will perhaps

4  have dates of other documents.  We haven't gotten that

5  privilege list from HP.

6      It may well be that, when we get the documents that

7  Mr. Pieja has promised he would send us, that we may need to

8  take a deposition.  We will rush this.  We do not want to delay

9  the September 27 hearing.  But this is an important issue,

10  moving that date of invention back.

11          **THE COURT:**  All right.

12          **MR. PIEJA:**  May I --

13          **THE COURT:**  Go ahead.

14          **MR. PIEJA:**  One last point, Your Honor.

15      To the date-of-invention issue, the local rules, the

16  patent local rules are very clear:  The plaintiff needs to

17  disclose that information with their infringement contentions.

18  And they are required to undertake a reasonable investigation

19  at that time to determine what, if any, date prior to the date

20  on the patents can be claimed.

21      And it seems pretty clear that a reasonable investigation

22  would include calling your own inventor and asking them, him or

23  her, whether or not there's anything that could be used to

24  predate.  It's not -- and none of that was done in this case.

25          So I think that Mr. Foster's claim of prejudice is

1    unfounded, because they had an obligation to undertake this

2    investigation months and months ago, and just didn't do it.

3           **THE COURT:**  Well, perhaps.  And the disclosure thing

4     that's required under our local rules is a good point.  But

5     nevertheless, here is the ruling:

6           When you use a subpoena of the U.S. District Court, the

7    documents that are produced in response belong to the Court,

8    not to the parties.  These are not Apple's documents.  These

9    are not for the lawyers to throw in the trash bin or secret

10   away.  These are documents that have been obtained from a third

11   party, using a subpoena of the U.S. District Court.  So those

12   documents should have been provided to counsel for the other

13   side.

14          Now, I understand that you -- both sides often will do

15   what you did, and work out, try to negotiate compromises with

16   the recipient, who doesn't sometimes want to cooperate anyway.

17   And so you're the one that served the subpoena, and you're the

18   one that gets to do that negotiating.  But once you do get the

19   documents, the other side is entitled to look at them.  All of

20   them.

21          Now, that leads to a second problem that I've seen.  And

22   that is:  Sometimes the person in the Apple position regrets

23   that they subpoenaed, and wants to select -- select some out so

24   that -- because those don't help them.  They just want the ones

25   that help, help the subpoenaing party.  They want to suppress

 1    the ones that don't help them.  Or help the other side.   So

 2    they negotiate a deal that allows the producing party, the

 3    third party, to hold back some, or claim privilege, or

 4    whatever.

 5         I've seen that, believe it or not.  And so, it's a

 6    gimmick.  It's a machination.

 7         So what you have got to do here is turn over everything

 8    that you have actually seen.  The ones that are under seal for

 9    the moment, because of requests by HP, my guess is some of

10    those are not privileged.  They just have been claimed to be

11    privileged.

12         And so either HP has got to give a privilege log, a

13    detailed privilege log, or you've got to give one.  And you

14    tell HP that I'm on the verge of making them turn over

15    everything, since you've already seen it, so they'd better do a

16    good job.  I'll give them one week to do a privilege log.  A

17    week from today.

18         And then you get -- Mr. Foster, you get to take a

19    deposition of the HP people.  Anybody you want.  You get two

20    depositions, to go out there and prove that this is a

21    phony-baloney privilege log.

22         All right?

23              **MR. FOSTER:**  Yes, Your Honor.

24              **THE COURT:**  So just -- and you can take -- Apple can

25     take -- if you believe it's phony-baloney, you get to take two

1   depositions.  So that's the way we're going to deal with this

2   problem.

3       And then one or both of you can bring a motion against HP,

4   and tell them -- and against the inventor -- to say:  You've

5   got to produce anything.  And it's got to not be under seal.

6       All right, what else --

7           MR. FOSTER:  My understanding is that Apple retain

8   the documents.

9       And you can correct me if I'm wrong, Mr. Pieja.

10      So they retain the documents, and they should be in a

11  position to provide them to the Court.

12          THE COURT:  Well, they should be, but the thing is,

13  do you -- do you want -- I'm not -- I'm going to make HP do

14  the privilege log, not Apple.  Unless HP drags its feet.  Then

15  Apple can do it.  But I don't know how Apple would know why it

16  would be privileged.

17      People claim so many things as privileged that are bogus

18  beyond belief.  I'm telling you, 90 percent of the claims of

19  privilege are bogus, by big firms.  I see it all the time.

20  Some young associate about two years older than that law

21  student (Indicating) is in charge.  And they are scared to

22  death.  So they claim privilege over everything.  We see it all

23  the time.  And then, and then general counsel is afraid to let

24  anything go out.  Privilege.

25      Well, it's not privileged.  Because some businessperson

1  saw it.  Or it was used for business purposes.  Or it was sent

2  to somebody on the outside.  I see this all the time.

3      So just tell HP they'd better do a good job.

4          **MR. PIEJA:**  We'll tell --

5          **THE COURT:**  That Judge Alsup is going to be on their

6  case if it turns out they've over-designated.

7          **MR. PIEJA:**  I will tell them that, Your Honor.  And I

8  can assure you that we have no idea what's in those --

9          **THE COURT:**  Yeah, you have.  You said you looked at

10  them.

11          **MR. PIEJA:**  We have not looked at any of the

12  documents they claimed privilege over.

13          **THE COURT:**  All right, good for you.  All right.  I

14  don't want to get into anything new here.  I want to -- I

15  think you all are raising things beyond the original letter.

16  So can we call it quits?

17          **MR. FOSTER:**  Nothing further, Your Honor.

18          **MR. PIEJA:**  Thank you, Your Honor, yes.

19          **THE COURT:**  I want to ask -- okay, we'll go off the

20  record.  I want to ask this law student a question.

21      (Off-the-Record discussion)

22      (Proceedings concluded)

23

24

25

1

2

3

4                    **<u>CERTIFICATE OF REPORTER</u>**

5        I, BELLE BALL, Official Reporter for the United States

6   Court, Northern District of California, hereby certify that the

7   foregoing is a correct transcript from the record of

8   proceedings in the above-entitled matter.

9

10                        *Belle Ball*

11              _____
                        /s/ Belle Ball

12             Belle Ball, CSR 8785, CRR, RDR

13              Wednesday, September 5, 2018

14

15

16

17

18

19

20

21

22

23

24

25